[5 NE3d 11, 982 NYS2d 40]

Marcia L. Caronia et al., Appellants, v Philip Morris USA, Inc., Respondent.

Argued November 13, 2013; decided December 17, 2013

440

**POINTS OF COUNSEL**

*Phillips & Paolicelli LLP*, New York City (*Victoria E. Phillips, Steven J. Phillips, Aryeh L. Taub* and *Lisa W. Davis* of counsel), for appellants. I. Plaintiffs' cause of action seeking medical surveillance is cognizable and timely under New York law. (*McKenna v Levy*, 182 App Div 678; *Williams v Supreme Council*, 80 App Div 402; *Strusburgh v Mayor of City of N.Y.*, 87 NY 452; *Rozell v Rozell*, 281 NY 106; *Gallagher v Samples*, 6 AD3d 659; *Friends for All Children, Inc. v Lockheed Aircraft Corp.*, 746 F2d 816; *In re Paoli R.R. Yard PCB Litig.*, 916 F2d 829; *Voss v Black & Decker Mfg. Co.*, 59 NY2d 102; *Derdiarian v Felix Contr. Corp.*, 51 NY2d 308.) II. Plaintiffs' claims sounding in negligence and strict liability were wrongly dismissed based on a misreading of both black letter New York law and record evidence. (*Kaufman v Cohen*, 307 AD2d 113; *Bano v Union Carbide Corp.*, 361 F3d 696; *Glod v Morrill Press Div. of Engraph*, 168 AD2d 954; *Roman v Radio Frequency Co.*, 207 AD2d 1012; *In re Paoli R.R. Yard PCB Litig.*, 916 F2d 829; *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87

NY2d 36; *LaBello v Albany Med. Ctr. Hosp.*, 85 NY2d 701; *Ely-Cruikshank Co. v Bank of Montreal*, 81 NY2d 399; *Aetna Life & Cas. Co. v Nelson*, 67 NY2d 169; *City of New York v State of New York*, 40 NY2d 659.) III. Plaintiffs' breach of warranty claims were improperly dismissed. (*Anderson v Hedstrom Corp.*, 76 F Supp 2d 422; *Robinson v Reed-Prentice Div. of Package Mach. Co.*, 49 NY2d 471; *Liriano v Hobart Corp.*, 92 NY2d 232; *Codling v Paglia*, 32 NY2d 330; *Denny v Ford Motor Co.*, 87 NY2d 248; *Voss v Black & Decker Mfg. Co.*, 59 NY2d 102; *Adamo v Brown & Williamson Tobacco Corp.*, 11 NY3d 545.)

*Latham & Watkins LLP*, Boston, Massachusetts (*Kenneth J. Parsigian* of counsel), for respondent. I. This Court should not create a cause of action for medical monitoring. (*Ortega v City of New York*, 9 NY3d 69; *Madden v Creative Servs.*, 84 NY2d 738; *Tobin v Grossman*, 24 NY2d 609; *Hall v United Parcel Serv. of Am.*, 76 NY2d 27; *Murphy v American Home Prods. Corp.*, 58 NY2d 293; *Sabetay v Sterling Drug*, 69 NY2d 329; *Trombetta v Conkling*, 82 NY2d 549; *Schiavone Constr. Co. v Mayo Corp.*, 56 NY2d 667; *532 Madison Ave. Gourmet Foods v Finlandia Ctr.*, 96 NY2d 280; *Bellevue S. Assoc. v HRH Constr. Corp.*, 78 NY2d 282.) II. Any medical monitoring cause of action should be carefully tailored to avoid uncabined liability. (*Boyle v Kelley*, 42 NY2d 88; *Lichtyger v Franchard Corp.*, 18 NY2d 528; *Abusio v Consolidated Edison Co. of N.Y.*, 238 AD2d 454; *Baity v General Elec. Co.*, 86 AD3d 948; *Marden v Maurice Villency, Inc.*, 29 AD3d 402; *Gonzalez v Delta Intl. Mach. Corp.*, 307 AD2d 1020; *Ramirez v Sears, Roebuck & Co.*, 286 AD2d 428; *In re Paoli R.R. Yard PCB Litig.*, 35 F3d 717; *Voss v Black & Decker Mfg. Co.*, 59 NY2d 102; *Yondola v Trabulsy*, 22 AD3d 483.) III. Any medical monitoring claim recognized by this Court should be subject to a three-year limitations period that accrues when a plaintiff actually suffers an increased risk of disease. (*Blanco v American Tel. & Tel. Co.*, 90 NY2d 757; *Snyder v Town Insulation*, 81 NY2d 429; *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87 NY2d 36; *MRI Broadway Rental v United States Min. Prods. Co.*, 92 NY2d 421; *LaBello v Albany Med. Ctr. Hosp.*, 85 NY2d 701; *Ackerman v Price Waterhouse*, 84 NY2d 535; *Barnes v American Tobacco Co. Inc.*, 984 F Supp 842, 161 F3d 127; *Engel v CBS, Inc.*, 93 NY2d 195; *Matter of Southeast Banking Corp.*, 93 NY2d 178; *Williams v Walsh*, 558 F2d 667.) IV. This Court should reject plaintiffs' invitation to opine on issues already decided by the Second Circuit. (*McCarthy v Olin Corp.*, 119 F3d 148; *Houston v Hill*, 482 US 451; *Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc.*,

344 F3d 211; *Rooney v Tyson*, 91 NY2d 685; *Matter of Southeast Banking Corp.*, 93 NY2d 178; *Kramer v Phoenix Life Ins. Co.*, 15 NY3d 539; *Tri-State Empl. Servs., Inc. v Mountbatten Sur. Co., Inc.*, 295 F3d 256; *Akins v Glens Falls City School Dist.*, 53 NY2d 325; *Voss v Black & Decker Mfg. Co.*, 59 NY2d 102; *Engel v CBS, Inc.*, 93 NY2d 195.)

*Product Liability Advisory Council, Inc.*, Reston, Virginia (*Hugh F. Young, Jr.*, of counsel), *Reed Smith LLP*, New York City (*Daniel K. Winters* of counsel), *Reed Smith LLP*, Philadelphia, Pennsylvania (*James M. Beck* of counsel), and *Reed Smith LLP*, Pittsburgh, Pennsylvania (*David J. Bird* of counsel), for Product Liability Advisory Council, Inc., amicus curiae. I. Creation of an expansive new theory of tort liability should only result from legislative action, not judicial decree. (*Ortega v City of New York*, 9 NY3d 69; *McKenna v Levy*, 182 App Div 678; *Williams v Supreme Council*, 80 App Div 402; *Williams v Village of Port Chester*, 72 App Div 505; *Wayte v Bowker Chem. Co.*, 180 App Div 568; *Tobin v Grossman*, 24 NY2d 609; *Bovsun v Sanperi*, 61 NY2d 219; *Trombetta v Conkling*, 82 NY2d 549; *Murphy v American Home Prods. Corp.*, 58 NY2d 293; *Hall v United Parcel Serv. of Am.*, 76 NY2d 27.) II. The Court should follow the majority rule and decline to create an independent cause of action for medical monitoring absent present physical injury. (*Ball v Joy Tech., Inc.*, 958 F2d 36; *Bellevue S. Assoc. v HRH Constr. Corp.*, 78 NY2d 282; *Schiavone Constr. Co. v Mayo Corp.*, 56 NY2d 667; *O'Brien v City of Syracuse*, 54 NY2d 353; *Hartford Acc. & Indem. Co. v Village of Hempstead*, 48 NY2d 218; *Parker v Mobil Oil Corp.*, 7 NY3d 434; *Murphy v American Home Prods. Corp.*, 58 NY2d 293; *Norwood v Raytheon Co.*, 414 F Supp 2d 659; *Cook v Rockwell Intl. Corp.*, 755 F Supp 1468.) III. The U.S. Supreme Court and numerous federal and state courts have not allowed actions for medical monitoring. (*Metro-North Commuter R. Co. v Buckley*, 521 US 424; *Norfolk & Western R. Co. v Ayers*, 538 US 135; *June v Union Carbide Corp.*, 577 F3d 1234; *In re Hanford Nuclear Reservation Litig.*, 534 F3d 986; *Syms v Olin Corp.*, 408 F3d 95; *Pisciotta v Old Natl. Bancorp*, 499 F3d 629; *Burton v R.J. Reynolds Tobacco Co.*, 884 F Supp 1515; *McCormick v Halliburton Co.*, 895 F Supp 2d 1152; *Norwood v Raytheon Co.*, 414 F Supp 2d 659.) IV. Plaintiffs' proposed cause of action would be inconsistent with this Court's precedents. (*Greenberg, Trager & Herbst, LLP v HSBC Bank USA*, 17 NY3d 565; *Voss v Black & Decker Mfg. Co.*, 59 NY2d 102; *Frank v DaimlerChrysler Corp.*, 292 AD2d 118; *Schiavone Constr. Co. v Mayo Corp.*, 56 NY2d 667; *Bellevue*

*S. Assoc. v HRH Constr. Corp.*, 78 NY2d 282; *Snyder v Town Insulation*, 81 NY2d 429.)

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Sheila L. Birnbaum, Douglas W. Dunham, Ellen P. Quackenbos* and *Douglas E. Flemming, III*, of counsel), for American Chemistry Council and another, amici curiae. I. Traditional tort law and sound public policy do not support the recognition of medical monitoring claims absent manifest physical injury. (*Kimbar v Estis*, 1 NY2d 399; *Norfolk & Western R. Co. v Ayers*, 538 US 135; *Metro-North Commuter R. Co. v Buckley*, 521 US 424.) II. The medical monitoring tort invites enormous numbers of speculative claims. (*In re Paoli R.R. Yard PCB Litig.*, 916 F2d 829; *Consolidated Rail Corporation v Gottshall*, 512 US 532; *Ortega v City of New York*, 9 NY3d 69; *Ball v Joy Mfg. Co.*, 755 F Supp 1344, 958 F2d 36; *Redland Soccer Club, Inc. v Department of Army of U.S.*, 55 F3d 827; *Rainer v Union Carbide Corp.*, 402 F3d 608; *Dumontier v Schlumberger Tech. Corp.*, 543 F3d 567; *Stoleson v United States*, 708 F2d 1217; *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 US 579; *Atchison, T. & S. F. R. Co. v Buell*, 480 US 557.) III. Permitting medical monitoring claims by asymptomatic plaintiffs would divert resources from those who are actually injured. (*Metro-North Commuter R. Co. v Buckley*, 521 US 424; *Ball v Joy Mfg. Co.*, 755 F Supp 1344.) IV. The recognition of new causes of action should be left to the legislature. (*Woods v Lancet*, 303 NY 349; *Murphy v American Home Prods. Corp.*, 58 NY2d 293; *Metro-North Commuter R. Co. v Buckley*, 521 US 424.)

*Jones Day*, New York City (*Sharyl A. Reisman* of counsel), *Jones Day*, Boston, Massachusetts (*Traci L. Lovitt* of counsel), *Jones Day*, Washington, D.C. (*Mary Ellen Powers* of counsel), *Jones Day*, Houston, Texas (*Nancy MacKimm* of counsel), *National Chamber Litigation Center, Inc.*, Washington, D.C. (*Kathryn Comerford Todd, Steven P. Lehotsky* and *Sheldon Gilbert* of counsel), *American Coatings Association, Inc.* (*Thomas J. Graves* of counsel), *Hollingsworth LLP* (*Eric G. Lasker* of counsel), *National Association of Manufacturers* (*Linda Kelly, Quentin Riegel* and *Patrick Forrest* of counsel), and *Pharmaceutical Research and Manufacturers of America* (*James M. Spears* and *Melissa B. Kimmel* of counsel) for Business Council of New York State, Inc., and others, amici curiae. I. The proposed cause of action is contrary to New York tort law. (*Strohm v New York, Lake Erie & W. R.R. Co.*, 96 NY 305; *Blanco v American Tel. & Tel. Co.*, 90 NY2d 757; *Kronos, Inc. v AVX Corp.*, 81 NY2d 90;

*Barrell v Glen Oaks Vil. Owners, Inc.*, 29 AD3d 612; *Sharma v Udwadia*, 309 AD2d 1250; *Cillo v Resjefal Corp.*, 16 AD3d 339; *Frank v DaimlerChrysler Corp.*, 292 AD2d 118; *Schiavone Constr. Co. v Mayo Corp.*, 56 NY2d 667; *Cedar & Wash. Assoc., LLC v Bovis Lend Lease LMB, Inc.*, 95 AD3d 448.) II. Authorizing medical monitoring claims based on increased risk would massively expand potential liability in New York. (*In re St. Jude Med., Inc.*, 425 F3d 1116; *Hirsch v CSX Transp., Inc.*, 656 F3d 359; *June v Union Carbide Corp.*, 577 F3d 1234; *In re Marine Asbestos Cases*, 265 F3d 861; *Norwood v Raytheon Co.*, 414 F Supp 2d 659; *Pisciotta v Old Natl. Bancorp*, 499 F3d 629; *In re Methyl Tertiary Butyl Ether [MTBE] Prods. Liab. Litig.*, 476 F Supp 2d 275; *Metro-North Commuter R. Co. v Buckley*, 521 US 424; *Ivory v International Bus. Mach. Corp.*, 37 Misc 3d 1221[A], 2012 NY Slip Op 52123[U]; *Van Wert v Randall*, 35 Misc 3d 1202[A], 2012 NY Slip Op 50534[U].) III. The legislature should decide whether to create a new equitable medical monitoring cause of action. (*George v Mt. Sinai Hosp.*, 47 NY2d 170; *Liff v Schildkrout*, 49 NY2d 622; *Becker v Schwartz*, 46 NY2d 401; *Donohue v Copiague Union Free School Dist.*, 47 NY2d 440; *Murphy v American Home Prods. Corp.*, 58 NY2d 293; *Hall v United Parcel Serv. of Am.*, 76 NY2d 27; *Madden v Creative Servs.*, 84 NY2d 738; *Ortega v City of New York*, 9 NY3d 69; *Jensen v General Elec. Co.*, 82 NY2d 77.)

*Kelner & Kelner*, New York City (*Joshua D. Kelner* of counsel), for American Legacy Foundation and another, amici curiae. I. The scientific and medical acceptance of the efficacy and clinical value of low-dose computed tomography in the early detection and treatment of lung cancer establishes a key element of medical surveillance claims, and that such claims are timely. (*Friends for All Children, Inc. v Lockheed Aircraft Corp.*, 746 F2d 816; *In re Paoli R.R. Yard PCB Litig.*, 916 F2d 829.) II. Overwhelming scientific evidence establishes that low-dose computed tomography is an effective surveillance mechanism for the early detection of smoking-attributable lung cancers, which is critical to making effective treatment possible. III. Fairness and equity demand that the tobacco industry be held accountable and made to provide high quality surveillance to redress the harm it has caused, especially with regard to those vulnerable populations it continues to target.

**OPINION OF THE COURT**

PIGOTT, J.

The United States Court of Appeals for the Second Circuit has asked us to determine whether this State recognizes an

independent equitable cause of action for medical monitoring and, if so, what the elements, appropriate statute of limitations and accrual date are for that particular cause of action.

## I

Plaintiffs, who are all over the age of 50, are current and/or former smokers of Marlboro cigarettes with histories of 20 pack-years[1] or more. None of the plaintiffs has been diagnosed with lung cancer, nor are they currently "under investigation by a physician for suspected lung cancer." Plaintiffs commenced this putative class action against Philip Morris USA, Inc. in federal court asserting claims sounding in negligence, strict liability and breach of the implied warranty of merchantability. Plaintiffs requested equitable relief, namely, the creation of a court-supervised program, at Philip Morris's expense, that would provide them with Low Dose CT Scanning of the chest (LDCT), which plaintiffs claim is a type of medical monitoring that assists in the early detection of lung cancer. At the completion of discovery, the District Court granted Philip Morris summary judgment with regard to plaintiffs' negligence and strict liability claims, but ordered further briefing concerning the breach of implied warranty claim and on the issue whether our Court would recognize an independent cause of action for medical monitoring (see Caronia v Philip Morris USA, Inc., 2010 WL 520558, *1, 2010 US Dist LEXIS 12168, *2-3 [ED NY Feb. 11, 2010]).

In the interim, plaintiffs served a fourth amended complaint asserting, in addition to their prior causes of action, a separate, equitable cause of action for medical monitoring, seeking the establishment of the medical monitoring program. The District Court dismissed the breach of implied warranty and medical monitoring claims, holding that although this Court would likely recognize the latter claim, plaintiffs "failed to plead that Philip Morris's allegedly tortious conduct is the reason that they must now secure a monitoring program that includes LDCT scans" (Caronia v Philip Morris USA, Inc., 2011 WL 338425, *3, 2011 US Dist LEXIS 12610, *8-9 [ED NY Jan. 13, 2011]). The United States Court of Appeals for the Second Circuit affirmed the dismissal of plaintiffs' negligence, strict liability and breach of implied warranty claims, but, acknowledging that this Court has not considered whether an independent cause of action for

---

1. A "pack-year" is the equivalent of smoking one pack of cigarettes a day for a year.

medical monitoring exists in New York, certified the following questions of law:

"(1) Under New York Law, may a current or former longtime heavy smoker who has not been diagnosed with a smoking-related disease, and who is not under investigation by a physician for such a suspected disease, pursue an independent equitable cause of action for medical monitoring for such a disease?

"(2) If New York recognizes such an independent cause of action for medical monitoring,

"(A) What are the elements of that cause of action?

"(B) What is the applicable statute of limitations, and when does that cause of action accrue?" (715 F3d 417, 450 [2013]).

We answer the first certified question in the negative, and decline to answer the second certified question as academic.

## II

Plaintiffs do not claim to have suffered physical injury or damage to property. They assert, rather, that they are at an "increased risk" for developing lung cancer and would benefit from LDCT monitoring, which they claim would allow them to discover the existence of cancers at an earlier stage, leading to earlier treatment.

A threat of future harm is insufficient to impose liability against a defendant in a tort context (*see* Prosser & Keeton, Torts § 30 at 165 [5th ed 1984]). The requirement that a plaintiff sustain physical harm before being able to recover in tort is a fundamental principle of our state's tort system (*see Kimbar v Estis*, 1 NY2d 399, 403 [1956] [no action will lie in negligence absent a "resultant injury to plaintiff"]; *see also Voss v Black & Decker Mfg. Co.*, 59 NY2d 102, 106-107 [1983] [plaintiff must sustain injury or damage before being able to recover under a strict products liability theory]). The physical harm requirement serves a number of important purposes: it defines the class of persons who actually possess a cause of action, provides a basis for the factfinder to determine whether a litigant actually possesses a claim, and protects court dockets from being clogged with frivolous and unfounded claims.

Having alleged no physical injury or damage to property in their complaint, plaintiffs' only potential pathway to relief is for

this Court to recognize a new tort, namely, an equitable medical monitoring cause of action. Plaintiffs claim that such a cause of action is "consistent with existing New York law," pointing to *Askey v Occidental Chem. Corp.* (102 AD2d 130 [4th Dept 1984]), a case involving a motion by plaintiffs seeking class certification to bring toxic exposure claims against a landfill owner, and, in particular, seeking recovery of future medical monitoring costs (*id.* at 131). Certain of the *Askey* plaintiffs alleged actual injury from the exposure, while others, like plaintiffs here, claimed only an increased risk of developing cancer or other diseases. The latter plaintiffs sought the imposition of a constructive trust on the owner's property to cover medical monitoring costs (*id.* at 132-133). Addressing the plaintiffs who had alleged no injury, the Appellate Division stated that "damages resulting from the enhanced risk of cancer and the threat of future harm not yet realized are *not compensable in a tort action . . .* , [but that] there is a basis in law to sustain a claim for medical monitoring as an element of *consequential damage*" (*id.* at 135 [emphasis supplied]). The *Askey* court derived its rationale from our holding in *Schmidt v Merchants Despatch Transp. Co.* (270 NY 287 [1936], *rearg denied* 271 NY 531 [1936]), which involved a worker who sued his employer for exposure to a toxic dust that resulted in his contracting an incurable lung disease (*id.* at 297).

The issue in *Schmidt*, however, involved when the cause of action from the toxic exposure accrued. This Court concluded that the *injury* to the plaintiff occurred "when the alleged negligence of the defendant caused the plaintiff to inhale the deleterious dust," making the defendant responsible for any damages that flowed from that injury (*id.* at 301). Even in *Schmidt*, however, this Court required some injury or damage to the plaintiff before he could recover. Having concluded that the injury or damage occurred at the time of "invasion" of the plaintiff's "personal or property rights," we addressed the issue of damages, holding that

> "[c]onsequential damages may flow later from an injury too slight to be noticed at the time it is inflicted. No new cause of action accrues when such consequential damages arise. *So far as consequential damages may be reasonably anticipated*, they may be included in a recovery *for the original injury*, though even at the time of the trial they may not yet exist" (*id.* at 300-301 [emphasis supplied]).

The *Askey* court, relying on *Schmidt*, concluded that the plaintiffs exposed to the landfill toxins had "an increased risk of invisible genetic damage and a present cause of action for their injury," and could recover " 'reasonably anticipated' consequential damages," including medical monitoring, so long as the plaintiffs could "establish with a reasonable degree of medical certainty that such expenditures [were] 'reasonably anticipated' to be incurred by reason of their exposure" (*Askey*, 102 AD2d at 137). The accrual rule set forth in *Schmidt*, and referenced in *Askey*, was replaced by CPLR 214-c, which requires a plaintiff to initiate a cause of action for personal injury damages caused by the latent effects of exposure to harmful substances within three years from the date the injury was discovered or could have been discovered "through the exercise of reasonable diligence."

Neither *Schmidt* nor *Askey* questioned this State's long-held physical harm requirement; rather, they merely accepted, for accrual purposes, that the injury accrued at the time of exposure. In light of section 214-c's enactment in 1986 (well after *Askey* and *Schmidt*), the *Askey* court's holding that persons who are exposed to toxins may recover all " 'reasonably anticipated' consequential damages," including the cost of future medical monitoring to "permit the early detection and treatment of maladies" (*Askey*, 102 AD2d 137), must be viewed in its proper context. Given that the injuries in *Askey* and *Schmidt* were deemed (for accrual purposes) to have been sustained at the time of *exposure*, it is understandable why the Courts in those cases would have concluded that any and all damages flowing from those "injuries," including damages for medical monitoring, would be potentially recoverable as consequential damages.

The Appellate Divisions have consistently found that medical monitoring is an element of damages that may be recovered only after a physical injury has been proven, i.e., that it is a form of remedy for an *existing* tort. For instance, in *Abusio v Consolidated Edison Co. of N.Y.* (238 AD2d 454 [2d Dept 1997], *lv denied* 90 NY2d 806 [1997]), where the plaintiffs brought a negligence cause of action arising out of exposure to toxins, the Court concluded that the trial court properly set aside the damage awards for emotional distress and medical monitoring, holding that although plaintiffs established that they were exposed to toxins, they failed to establish that they had a "rational basis" for their fear of contracting the disease, i.e., they failed

to establish a "clinically demonstrable presence of [toxins] in the plaintiff's body, or some indication of [toxin]-induced disease, i.e., some physical manifestation of [toxin] contamination" (*id.* at 454-455).

■ Courts have followed the test enunciated in *Abusio* in a number of cases where medical monitoring was sought as an element of damages (*see Osarczuk v Associated Univs., Inc.*, 36 AD3d 872, 878 [2d Dept 2007] [remitting case to trial court for consideration of the plaintiffs' motion as it related to causes of action seeking damages and equitable relief for personal injuries and property damage]; *Allen v General Elec. Co.*, 32 AD3d 1163, 1165-1166 [4th Dept 2006] [in order to obtain medical monitoring damages, plaintiff must establish "clinically demonstrable presence" of toxins in the body or evidence of toxin-induced disease]; *Dangler v Town of Whitestown*, 241 AD2d 290 [4th Dept 1998] [medical monitoring considered as damages]). In each of these cases, the plaintiffs alleged either personal injury or property damage or both.[2]

Federal courts sitting in New York have surmised, in reliance on *Askey* and *Abusio*, that this Court would recognize an independent equitable medical monitoring cause of action where a plaintiff's only "injury" is the "financial burden associated with periodic medical monitoring" (*Abbatiello v Monsanto Co.*, 522 F Supp 2d 524, 538-539 [SD NY 2007]), or where the plaintiff alleges absolutely no injury at all (*see Gibbs v E.I. DuPont De Nemours & Co., Inc.*, 876 F Supp 475, 478-479 [WD NY 1995]; *Beckley v United States*, 1995 WL 590658, *4, 1995 US Dist LEXIS 14599, *11 [SD NY 1995]; *but see In re World Trade Ctr. Disaster Site Litig.*, 2006 WL 3627760, *3, 2006 US Dist LEXIS 93639, *9 [SD NY 2006] [holding that medical monitoring damages may be recovered "if causes of action are otherwise proved and if the remedies are held to be appropriate and in accordance with the law" but that medical monitoring does not constitute an independent cause of action]). *Askey* and *Abusio*, however, necessitate that the plaintiff sustain a physical injury before he or she may recover consequential damages for medical monitoring.

The highest courts in our sister states are divided on whether an independent cause of action for medical monitoring should

2. [1] To the extent that any of these, or other, cases can be read as recognizing an independent cause of action for medical monitoring absent allegation of any physical injury or property damage, they should not be followed.

lie absent any allegation of present physical injury or damage to property. Some have refused to recognize such equitable claims for the imposition of a court-supervised medical monitoring program absent such injury or harm (*see Henry v Dow Chem. Co.*, 473 Mich 63, 75-76, 701 NW2d 684, 690 [2005] [reaffirming "the principle that a plaintiff must demonstrate a present physical injury to person or property in addition to economic losses that result from that injury in order to recover under a negligence theory" (emphasis omitted)]; *see also Lowe v Philip Morris USA, Inc.*, 344 Or 403, 414-415, 183 P3d 181, 187 [2008] ["negligent conduct that results only in a significantly increased risk of future injury that requires medical monitoring does not give rise to a claim for negligence"]). Others, however, have dispensed with the physical injury requirement and have recognized an independent medical monitoring cause of action (*see Donovan v Philip Morris USA, Inc.*, 455 Mass 215, 225-227, 914 NE2d 891, 901-903 [2009] [concluding that the cause of action is in tort, not equity]; *Bower v Westinghouse Elec. Corp.*, 206 W Va 133, 140-142, 522 SE2d 424, 431-433 [1999] [holding that a plaintiff who does not allege a present physical injury may recover future medical monitoring costs]; *Redland Soccer Club, Inc. v Department of the Army & Dept. of Defense of the U.S.*, 548 Pa 178, 195-196, 696 A2d 137, 145-146 [1997] [stating that the injury in a medical monitoring claim is an economic one]; *Burns v Jaquays Min. Corp.*, 156 Ariz 375, 380, 752 P2d 28, 33 [Ct App 1988]).

Plaintiffs ask us to follow the second line of cases—*Donovan* in particular—and recognize a cause of action for medical monitoring because Philip Morris's "wrong," i.e., its alleged failure to design a safer cigarette that delivers lower amounts of tar, should not be without a remedy. Although "the desire to provide an avenue to redress wrongs is . . . an important consideration underlying our tort jurisprudence, the recognition that there has been an interference with an interest worthy of protection has been the beginning, not the end, of our analysis" (*Ortega v City of New York*, 9 NY3d 69, 78 [2007]). This Court undoubtedly has the authority to recognize a new tort cause of action, but that authority must be exercised responsibly, keeping in mind that a new cause of action will have both "foreseeable and unforeseeable consequences, most especially the potential for vast, uncircumscribed liability" (*Madden v Creative Servs.*, 84 NY2d 738, 746 [1995] [citations omitted]).

> "Tort liability . . . depends on balancing competing interests: the question remains who is legally bound

to protect plaintiffs' right at the risk of liability. . . . To identify an interest deserving protection does not suffice to collect damages from anyone who causes injury to that interest . . . Not every deplorable act . . . is redressable in damages" (*id.* at 746 [citation, internal quotation marks and brackets omitted]).

■ We do not deny that there are significant policy reasons that favor recognizing an independent medical monitoring cause of action. There is certainly "an important public health interest in fostering access to medical testing" for those whose exposure has resulted in an increased risk of disease, and such testing could lead to early detection and treatment, not only mitigating future illness but also reducing the cost to the tortfeasor (*Bower*, 206 W Va at 140, 522 SE2d at 431, quoting *Potter v Firestone Tire & Rubber Co.*, 6 Cal 4th 965, 1008, 863 P2d 795, 824 [1993]). However, "the potential systemic effects of creating a new, full-blown, tort law cause of action" cannot be ignored (*Metro-North Commuter R. Co. v Buckley*, 521 US 424, 443-444 [1997] [refusing to recognize a tort claim for medical monitoring costs where the plaintiff was exposed to asbestos but had not manifested symptoms of a disease]). For instance, dispensing with the physical injury requirement could permit "tens of millions" of potential plaintiffs to recover monitoring costs, effectively flooding the courts while concomitantly depleting the purported tortfeasor's resources for those who have actually sustained damage (*id.* at 442-444).[3] Moreover, it is speculative, at best, whether asymptomatic plaintiffs will ever contract a disease; allowing them to recover medical monitoring costs without first establishing physical injury would lead to the inequitable diversion of money away from those who have actually sustained an injury as a result of the exposure.

---

3. Contrary to the dissent's contention (dissenting op at 456), the concern that a medical monitoring cause of action would promote frivolous claims is not "unfounded." For instance, in West Virginia, shortly after the state's highest court decided *Bower*, a class action lawsuit was filed against cigarette manufacturers on behalf of 250,000 West Virginia smokers seeking damages for medical monitoring notwithstanding the fact that they had not been diagnosed with any smoking-related disease (*see* Victor E. Schwartz et al., *Medical Monitoring: The Right Way and the Wrong Way*, 70 Mo L Rev 349, 382 n 190 [2005]; *see also In re West Virginia Rezulin Litig.*, 214 W Va 52, 73, 585 SE2d 52, 73 [2003] [relying on *Bower* in holding that the lower court erred in denying class certification of 5,000 plaintiffs seeking medical monitoring damages]).

From a practical standpoint, it cannot be overlooked that there is no framework concerning how such a medical monitoring program would be implemented and administered. Courts generally lack "the technical expertise necessary to effectively administer a program heavily dependent on scientific disciplines such as medicine, chemistry, and environmental science" (*Henry*, 473 Mich at 91-92, 701 NW2d at 698-699). The legislature is plainly in the better position to study the impact and consequences of creating such a cause of action, including the costs of implementation and the burden on the courts in adjudicating such claims (*see* Schwartz, *Medical Monitoring: The Right Way and the Wrong Way*, 70 Mo L Rev at 382-385).[4]

## III

We conclude that the policy reasons set forth above militate against a judicially-created independent cause of action for medical monitoring. Allowance of such a claim, absent any evidence of present physical injury or damage to property, would constitute a significant deviation from our tort jurisprudence. That does not prevent plaintiffs who have in fact sustained physical injury from obtaining the remedy of medical monitoring. Such a remedy has been permitted in this State's courts as consequential damages, so long as the remedy is premised on the plaintiff establishing entitlement to damages on an already existing tort cause of action. Accordingly, we answer the first certified question in the negative, and we decline to answer the second certified question as academic.

Chief Judge LIPPMAN (dissenting). Rarely are we presented with a case more worthy of the age-old maxim that equity will not suffer a wrong without a remedy. Where, as here, it is within the Court's power to provide a vehicle for plaintiffs to seek equitable relief capable of forestalling profound suffering and death, judicial hesitance and legislative deference only serve to thwart the ends of justice. Because I believe that overall fairness demands that New York recognize an independent equitable medical monitoring cause of action for smokers who can prove that their enhanced risk of cancer was caused by the

---

4. The state legislature in Louisiana, one year after its highest court recognized an independent cause of action for medical monitoring in *Bourgeois v A.P. Green Indus., Inc.* (716 So 2d 355 [La 1998]) which did not require the plaintiff to establish any physical harm, amended its civil code to eliminate medical monitoring as a compensable item of damage absent manifest physical injury or damage (*see* La Civ Code Ann art 2315).

wrongful conduct of tobacco companies, I dissent and would answer the first certified question in the affirmative.[1]

Relief in the form of medical monitoring has developed in response to "a world in which people regularly encounter environmental toxins, the effects of which are largely unknown" (*Recent Cases, Supreme Judicial Court of Massachusetts Recognizes Cause of Action for Medical Monitoring of Tobacco Users*, 123 Harv L Rev 1771, 1771 [2010]), and the "growing recognition that exposure to toxic substances . . . may cause substantial injury which should be compensable even if the full effects are not immediately apparent" (*Donovan v Philip Morris USA, Inc.*, 455 Mass 215, 225, 914 NE2d 891, 901 [2009], citing *Hansen v Mountain Fuel Supply Co.*, 858 P2d 970, 977 [Utah 1993]). It is undisputed in the scientific community and conceded by defendant Philip Morris—albeit only since 1999—that cigarettes are a lethal and addictive product which contain cancer-causing carcinogens. Lung cancer is the leading cause of cancer death in the United States, and smoking is responsible for between 80 and 90 percent of lung cancer deaths. Moreover, the high mortality rate in lung cancer patients is largely due to the latent nature of the disease, whose symptoms typically manifest only after the cancer has metastasized, at which point survival rates are in the single digits. However, advances in imaging technology have resulted in the development of Low-Dose Computerized Tomography scanning of the chest (LDCT), a monitoring method widely acknowledged in the medical community as allowing for the detection of lung cancer tumors at a much earlier stage than previously possible. LDCT can detect cancer when it is still localized, at a point when surgery and/or chemotherapy have vastly higher success rates. The significance of this technological advancement cannot be overstated. It is a critical development in our society's medical knowledge that has the potential of transforming lung cancer into a survivable disease.

Furthermore, plaintiffs have submitted expert evidence attesting that Marlboro cigarettes expose smokers to excessive and unreasonably dangerous levels of carcinogens. These experts also contend that, since the time Marlboro cigarettes were first sold, it was technologically feasible for Philip Morris to design a cigarette which delivered a dramatically lower

---

1. In light of the Court's disposition, it is unnecessary for me to formally reach the second certified question. However, in the course of responding to the majority opinion, I will of necessity discuss particular features of the proposed cause of action that would make it both administratively manageable and effective in achieving its equitable purpose.

amount of tar but were equally "pleasurable," reducing exposure to carcinogenic agents by 100 fold without reducing the product's "utility."[2]

We are thus presented with a defendant who has allegedly engaged in long-term and continuing misconduct and plaintiffs who, as a proximate result of that wrongdoing, have allegedly reached a risk level threshold for lung cancer at which medical experts believe LDCT screening is "reasonable and necessary" to facilitate early detection so as to avert terrible suffering and near-certain death. Legal recovery eludes these plaintiffs, however, because they do not manifest the kind of physical, symptomatic injury traditionally required for a valid tort claim. Furthermore, plaintiffs are unlikely to manifest symptoms of lung cancer unless and until the disease is at an advanced stage, at which point mortality rates are high and the only treatments available would be aimed at extending their lives, not saving them.

It is difficult to envision a scenario more worthy of the exercise of this Court's equitable powers. Indeed, it is contrary to the spirit of New York law to deny these plaintiffs an opportunity to seek relief in equity where the policy justifications for the proposed medical monitoring cause of action are so compelling. First, monitoring claims promote the "important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease, particularly in light of the value of early diagnosis and treatment for many cancer patients" (*Potter v Firestone Tire & Rubber Co.*, 6 Cal 4th 965, 1008, 863 P2d 795, 824 [1993]; *accord Meyer ex rel. Coplin v Fluor Corp.*, 220 SW3d 712, 718 [Mo 2007]; *Bower v Westinghouse Elec. Corp.*, 206 W Va 133, 140, 522 SE2d 424, 431 [1999]; *Redland Soccer Club, Inc. v Department of the Army & Dept. of Defense of the U.S.*, 548 Pa 178, 194, 696 A2d 137, 145 [1997]; *Ayers v Township of Jackson*, 106 NJ 557, 603, 525 A2d 287, 311 [1987]). Second, implementing a medical monitoring program has

---

**2.** Specifically, plaintiffs' experts contend that it was feasible for Philip Morris to make design improvements that would have reduced Marlboros' excessive carcinogenicity by increasing a smoker's "resistance to draw," utilizing a less carcinogenic "filler" tobacco, reducing the protein content of tobacco, avoiding its over-fertilization, reducing or eliminating the use of flue curing, and reducing the use of sugars in Marlboros.

economic benefits not only for plaintiffs,[3] but also for tobacco companies, since the cost of monitoring and treatment upon early detection pales in comparison to the expenses of treatment post-diagnosis, not to mention those incurred by defendants in wrongful death suits (*see Ayers*, 106 NJ at 604, 525 A2d at 312 ["The availability of a substantial remedy before the consequences of the plaintiffs' exposure are manifest may also have the beneficial effect of preventing or mitigating serious future illnesses and thus reduce the overall costs to the responsible parties"]; *accord Burns v Jaquays Min. Corp.*, 156 Ariz 375, 380, 752 P2d 28, 33 [1987]). Third, requiring defendant to cover the costs of reasonably necessary medical monitoring would serve an important deterrence function. As evidenced by the District Court's dismissal of plaintiffs' negligence, strict liability and breach of warranty claims, the burdens of proof for injury, causation and timeliness in tort make the threat of legal action ineffective at deterring the kind of misconduct alleged here. This is especially true since, by the time lung cancer symptoms manifest, the long period of latency erects obstacles to establishing the causal connection between the tortious conduct and the onset of plaintiffs' disease (*see Ayers*, 106 NJ at 604, 525 A2d at 312; Arvin Maskin et al., *Medical Monitoring: A Viable Remedy for Deserving Plaintiffs or Tort Law's Most Expensive Consolation Prize?*, 27 Wm Mitchell L Rev 521, 526-527 [2000] ["the longer the latency period, the more likely that plaintiffs will have exercised other lifestyle or occupational choices that arguably could have contributed to their illness, rendering a verdict against the defendants less likely"]). Finally, it is just to shift the cost of medical monitoring onto the tortfeasor because "it would be inequitable for an individual wrongfully exposed to dangerous toxins, but unable to prove that cancer or disease is likely, to have to pay the expense of medical monitoring when such intervention is clearly reasonable and necessary" (*Potter*, 6 Cal 4th at 1008, 863 P2d at 824 [citations omitted]).

In sum, where a defendant's alleged misconduct causes severe harm, and the opportunity exists to save lives and alleviate

---

3. Though not addressed by the majority, Philip Morris is unpersuasive in arguing that, due to promised coverage of preventive procedures under the Affordable Care Act, it is a foregone conclusion that plaintiffs and the class they seek to represent will soon obtain free access to LDCT monitoring. To the extent that this not-yet-effective legislation may provide widespread coverage for LDCT monitoring, the potential for an offset against plaintiffs' recovery under the collateral source rule should not preclude liability.

suffering, countervailing public policy considerations must be extraordinarily compelling to justify such an "absolute failure of justice" (*Strusburgh v Mayor of City of N.Y.*, 87 NY 452, 456 [1882]). The majority's justifications fall short of the mark.

In refusing to recognize an independent equitable action for medical monitoring, the majority raises the specter of a flood of frivolous claims brought by asymptomatic plaintiffs, leading to the "inequitable diversion of money away from those who have actually sustained an injury as a result of the exposure" (majority op at 451). This fear is unfounded.[4] As an initial matter, the surest way to safeguard against frivolous claims and limitless liability is to carefully tailor the elements of a cause of action, which is by no means an insurmountable challenge here. The first step is to prescribe an alternatively defined injury requiring definite and identifiable proof. Plaintiffs urge us to define the injury as the enhanced risk of cancer recognized by medical experts according to specifically defined thresholds of age (at least 50 years old) and exposure to carcinogens (at least 20 pack-years). Such an approach neither opens the litigation floodgates nor unduly burdens the courts. Indeed, linking the injury element to standards recognized in the scientific community is a familiar judicial exercise in the context of claims related to latent injury due to exposure to toxic substances. For example, in *Giordano v Market Am., Inc.* (15 NY3d 590, 601 [2010]), this Court was called upon to interpret CPLR 214-c's requirement that a plaintiff " 'allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined' before the expiration of the otherwise-

---

4. The majority's reliance on problems related to medical monitoring litigation in West Virginia after *Bower v Westinghouse Elec. Corp.* (206 W Va 133, 522 SE2d 424 [1999]) is misplaced. *Bower* failed to adequately delineate the elements of the recognized cause of action (*see Maskin, supra* at 538 [discussing weaknesses of the *Bower* approach]). Unlike the limitations proposed here, *Bower* did not require plaintiffs to prove that their enhanced risk of disease correlated to a threshold risk level recognized by the medical community as rendering monitoring reasonable and necessary. Nor did *Bower* require plaintiffs to demonstrate the existence of an effective treatment in order to justify medical monitoring. Finally, the remedy in *Bower* is not limited to a court-administered fund for a monitoring program, but rather allows for lump-sum awards. That West Virginia does not represent an ideal model for an independent equitable action for medical monitoring does not militate against recognition of such a claim that is subject to appropriate limitations (*see* Victor E. Schwartz et al., *Medical Monitoring: The Right Way and the Wrong Way*, 70 Mo L Rev 349, 366-368 [2005]).

applicable limitation period" (*id.* at 600). This Court determined that "the test is one of general acceptance of that [causal] relationship in the relevant technical, scientific or medical community" (*id.* at 601). We rejected the argument that courts are ill-equipped to determine whether the element of causation had been proven based on such expert testimony since "[the] test is familiar to New York lawyers and judges. Our courts follow *Frye v United States* (293 F 1013 [DC Cir 1923]) in making 'general acceptance' the test for admitting expert testimony about scientific principles or discoveries" (*id.*, citing *People v LeGrand*, 8 NY3d 449, 457 [2007] and *People v Wesley*, 83 NY2d 417, 422 [1994]). Just as courts are capable of applying the "general acceptance" standard to discern whether a plaintiff has satisfied the causality requirement under CPLR 214-c, so too are we equipped to apply analogous standards based on contemporary scientific principles to "determine whether a litigant actually possesses a claim" (majority op at 446) in equity for medical monitoring (*see Donovan*, 455 Mass at 226-227, 914 NE2d at 902 [enumerating elements of a cause of action for medical monitoring and noting that "(p)roof of these elements usually will require competent expert testimony"]; *In re Paoli R.R. Yard PCB Litig.*, 916 F2d 829, 852 [3d Cir 1990], *cert denied* 499 US 961 [1991]; *Ayers*, 106 NJ at 606, 525 A2d at 312; *Hansen*, 858 P2d at 979-980).

Beyond circumscribing the alternative injury requirement, the claim's scope would be further curtailed by the other enumerated elements. For instance, plaintiffs would still have the burden of proving defendant's tortious conduct, however defined (*see Donovan*, 455 Mass at 226, 914 NE2d at 902 [negligence]; *Hansen*, 858 P2d at 979 [same]; *Potter*, 6 Cal 4th at 974, 863 P2d at 800 [same]; *Redland*, 548 Pa at 195-196, 696 A2d at 145-146 [same]; *Bower*, 206 W Va at 139, 140, 522 SE2d at 430, 431 ["tortious conduct"]; *Abbatiello v Monsanto Co.*, 522 F Supp 2d 524, 539 [SD NY 2007] [predicting that this Court would recognize an independent action for medical monitoring and would allow plaintiffs to prove wrongdoing sounding in negligence, strict liability, abnormally dangerous activities, nuisance, or trespass]). Furthermore, despite the uncontroverted medical evidence that nicotine's addictive qualities, combined with the additives in cigarettes which enhance those propensities, put the addictive nature of cigarettes on par with cocaine and heroin (*see e.g. Evans v Lorillard Tobacco Co.*, 465 Mass 411, 420, 990 NE2d 997, 1009 [2013]), smoking cigarettes

undeniably involves a conscious (not to mention legal) act of exposure to carcinogens. Heavy smokers are thus different from individuals whose exposure to toxic substances is wholly inadvertent. In this sense, smokers' claims for medical monitoring could be further restricted by the availability of tort defenses such as contributory negligence (see Donovan, 455 Mass at 226 n 11, 914 NE2d at 901 n 11; Potter, 6 Cal 4th at 974, 863 P2d at 801 [comparative fault principles may apply in smoking context]; Dangler v Town of Whitestown, 241 AD2d 290, 294 [4th Dept 1998] [a jury may be entitled to consider plaintiffs' "voluntary exposure to carcinogens, for example, by smoking"]).

The majority's position that the proposed cause of action threatens a deluge of frivolous claims is also undermined by the fact that plaintiffs would need to prove: (1) the existence of an efficacious method of screening for early detection which not only (2) conforms with the medical standard of care but (3) is also reasonably necessary given the enhanced risk of cancer (see e.g. Hansen, 858 P2d at 979-980). In this case, these requirements would, among other things, necessitate proof that, had Philip Morris marketed and sold "safer" cigarettes, plaintiffs would have smoked them. A recent case of this Court evidences the difficulty of supplying such proof (Adamo v Brown & Williamson Tobacco Corp., 11 NY3d 545 [2008] [plaintiffs failed to establish tobacco manufacturer's liability in a product liability action where there was no proof that the proposed alternative design (a "safer" cigarette) was equivalent in "function" or "utility" in terms of providing smokers with equivalent satisfaction]). When properly tailored, the cause of action would set a high bar for plaintiffs to meet, dispelling concerns of any onslaught of meritless litigation.

Nor is the majority warranted in its fear that recognizing an appropriately tailored cause of action for medical monitoring for plaintiff smokers would expose defendants to boundless liability. Notably, this concern has been voiced in the toxic tort context primarily regarding the availability of lump-sum money damages, rather than injunctive relief (see e.g. Ayers, 106 NJ at 609-610, 525 A2d at 314 [upholding the jury's lump-sum award but noting the court's preference for relief in the form of a court-administered fund for medical monitoring]; Victor E. Schwartz et al., Medical Monitoring: The Right Way and the Wrong Way, 70 Mo L Rev 349, 369-373 [2005] [arguing that "(l)ump-sum awards are starkly at odds with the traditional scientific goal of medical monitoring and surveillance: detecting the onset of

disease," and noting that the lack of assurance that such damages will be spent on surveillance presents the danger of a windfall recovery]).

In particular, the majority relies on *Metro-North Commuter R. Co. v Buckley* (521 US 424 [1997]), where asymptomatic plaintiffs who had been exposed to asbestos sued their employer under the Federal Employers' Liability Act (45 USC § 51 *et seq.*) for negligent infliction of emotional distress, seeking, inter alia, compensatory damages for future medical monitoring. In denying plaintiffs money damages, the Supreme Court pointed out that cases permitting recovery of a monitoring remedy without proof of manifest injury were based on equitable or injunctive decrees (*id.* at 440-441, citing *Ayers*, 106 NJ at 608, 525 A2d at 314; *Hansen*, 858 P2d at 982; *Potter*, 6 Cal 4th at 1010, 863 P2d at 825; *Burns*, 156 Ariz at 381, 752 P2d at 34). The Supreme Court's cautions as to runaway liability thus have little bearing on the certified question before this Court, which concerns the availability of an *equitable* remedy in an independent *equitable* cause of action. Indeed, Justice Ginsburg's dissent observed that "non-injured" claimants were at liberty to seek an equitable remedy (*Metro-North*, 521 US at 455-456 [Ginsburg, J., dissenting] ["(Plaintiff) may replead a claim for relief and recover for medical monitoring, but he must receive that relief in a form other than a lump sum"]).[5]

Finally, establishing a court-administered fund to finance a medical surveillance program is a "highly appropriate exercise of the Court's equitable powers" (*Ayers*, 106 NJ at 608, 525 A2d at 608). In reaching a contrary conclusion, the majority claims that courts lack the requisite expertise to administer a program "dependent on scientific disciplines" and that "there is no framework concerning how such a medical monitoring program would be implemented and administered" (majority op at 452). In fact, valuable guidance on the administration of medical monitoring programs has been provided by the courts that have

---

**5.** *Askey v Occidental Chem. Corp.* (102 AD2d 130 [4th Dept 1984]), *Abusio v Consolidated Edison Co. of N.Y.* (238 AD2d 454 [2d Dept 1997]) and their progeny similarly addressed medical monitoring as an aspect of consequential damages in an action at law. As such, those cases are inapposite to the questions certified to the Court, and the majority's analysis of them is misdirected. The relevance of *Askey* here is that New York courts have recognized the desirability of providing equitable relief in the form of monitoring, while acknowledging the difficulties inherent in pursuing it as a remedy in a traditional tort action. An independent equitable cause of action for medical monitoring would resolve this dilemma.

granted such relief. For example, almost 15 years ago a Florida appellate court outlined specific guidelines to follow in running a medical monitoring fund (*see Petito v H.H. Robins Co., Inc.*, 750 So 2d 103, 107 [Fla Dist Ct App 1999]). In adopting the *Petito* framework, the Court of Appeals of Maryland recently summarized the following steps that may be appropriate for courts to follow if plaintiffs can demonstrate an entitlement to medical monitoring relief:

> "(1) appoint a plan administrator; (2) with the administrator's advice, approve an advisory panel of persons qualified and knowledgeable in the relevant medical field or fields to supervise, among other things, the persons who consume or undergo medication and treatment, and select a list of skilled and neutral examining physicians to perform the medical tests; (3) establish a time frame for those eligible to obtain the monitoring; and (4) authorize the plan administrator to pay the reasonable amounts of claims based on submitted reports and findings by the monitoring physicians" (*Exxon Mobil Corp. v Albright*, 433 Md 303, 388, 71 A3d 30, 81 [2013], citing *Petito*, 750 So 2d at 106).

These and similar guidelines provide useful roadmaps for administering a medical monitoring program.

The common law must evolve with advances in scientific understanding to fashion relief and provide redress for wrongs newly understood, particularly when such relief can prevent devastating disease and death. In equity, "there is often an element of discretion, but never a discretion that is absolute as not to bend before the blast of extraordinary circumstances" (*Evangelical Lutheran Church v Sahlem*, 254 NY 161, 167 [1930, Cardozo, Ch. J.]). In the face of such circumstances, the majority resolutely stands frozen in time as it denies plaintiffs the opportunity to take advantage of life-saving technology. This result is indefensible when equitable relief is well within the province of this Court.

Judges GRAFFEO, READ and ABDUS-SALAAM concur with Judge PIGOTT; Chief Judge LIPPMAN dissents in an opinion in which Judge RIVERA concurs; Judge SMITH taking no part.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court's

Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, first certified question answered in the negative and second certified question not answered as academic.